**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MICROSOFT MOBILE, INC.  and MICROSOFT MOBILE OY,<br><br>                              Plaintiffs,<br><br>       v.<br><br>INTERDIGITAL, INC.; INTERDIGITAL COMMUNICATIONS, INC; INTERDIGITAL TECHNOLOGY CORPORATION; INTERDIGITAL PATENT HOLDINGS, INC.; INTERDIGITAL HOLDINGS, INC.; and IPR LICENSING, INC.<br><br>                              Defendants. | Case No. _____<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs Microsoft Mobile, Inc. and Microsoft Mobile Oy ("MMI," "MMO,"

respectively, or "Microsoft" or "Plaintiffs," collectively) allege as follows for their Complaint

against InterDigital, Inc., InterDigital Communications, Inc., InterDigital Technology

Corporation, InterDigital Patent Holdings, Inc., InterDigital Holdings, Inc., and IPR Licensing,

Inc. (collectively, "InterDigital" or "Defendants").

**NATURE OF THE ACTION**

1.     Microsoft brings this action to enjoin InterDigital's abusive licensing practices

and unlawful monopolization in relevant markets for third-generation ("3G") and fourth-

generation ("4G") cellular technologies. Microsoft also seeks treble the damages caused by

InterDigital's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

2.     InterDigital has engaged in an unlawful scheme to acquire and exploit monopoly

power over technology necessary for companies to make 3G and 4G cellular devices.

InterDigital pursued its scheme with false promises to make its technologies available on Fair, Reasonable, and Non-Discriminatory ("FRAND") terms.

3.      InterDigital's scheme relies upon certain patents that have market power because they cover technology mandated by standards that cellular devices must implement. Such patents differ from other patents because they are infringed simply and necessarily by practicing the standard. These standards are drafted by the members of a standard setting organization ("SSO"), and the patents, such as InterDigital's patents, that cover these standards are referred to as "standard essential patents" ("SEPs").

4.      InterDigital falsely promised to license its SEPs on FRAND terms so that other members of the SSO would include InterDigital technologies in the standards. InterDigital correspondingly manipulated the standard-setting process to exclude alternate technologies.

5.      Although InterDigital participated in the cellular device standard-setting process, InterDigital does not make or sell products that practice the resulting standards. Instead, InterDigital's revenue stems from licensing its patents to those companies that do make and sell products using the standards.

6.      After deceiving the SSO and its members, InterDigital has exploited its unlawfully acquired power against Microsoft. It has:

- refused to honor the obligation to license its patents on FRAND terms;

- demanded excessive and discriminatory royalties from companies that sell 3G and 4G devices;

- tied access to its U.S. patents to its foreign patents along with the requirement that licensees pay royalties on worldwide sales;

- tied access to its SEPs to licensing of its admittedly non-essential patents;

- transferred hundreds of SEPs to a controlled entity in order to "double dip" in its royalty demands;

- misappropriated technical information submitted by other standards members so that it could obtain patents in its name and accordingly profit from technologies created by others;

- discriminated in its pricing demands against Microsoft based on Microsoft's smaller market share relative to Microsoft's competitors;

- tied access to its SEPs and any proposed license terms for them to prospective licensees' agreement to mandatory non-disclosure terms while refusing to disclose license terms provided to Microsoft's competitors to hide InterDigital's discriminatory pricing; and

- pursued baseless infringement actions and baseless demands for injunctive relief and exclusion orders designed to increase Microsoft's costs and thereby coerce Microsoft to capitulate to InterDigital's unreasonable, non-FRAND demands.

7.    InterDigital's sworn testimony and investor disclosures expose its intent to deceive and reveal that it never intends to honor its FRAND promises. InterDigital's litigation experts concede that it has been charging inflated prices for access to its SEPs solely because they are written into the cellular standards. Despite spending millions of dollars on litigation solely seeking exclusion of Microsoft products, InterDigital concedes that it has no interest in actually excluding anything:  "ultimately, [InterDigital's] objective is actually not to secure exclusion …." Rather, InterDigital merely sought to leverage the *threat* of an exclusion order in negotiations. Similarly, even while purporting to negotiate a license to all its SEPs, InterDigital

transferred SEPs to related entities so that those entities could separately enforce the transferred SEPs against Microsoft and others.

8. By its acts, practices, and conduct, InterDigital has unlawfully monopolized each of the Relevant Technology Markets (*see* ¶ 38). InterDigital has monopoly power in the Relevant Technology Markets. It is the sole supplier in those markets, has excluded all competition, and has the power to charge supra-competitive prices and is in fact doing so. InterDigital's actions have injured competition by excluding alternate technologies and imposed unjustified costs on Microsoft and other companies that are consumers of the technologies. Absent InterDigital's wrongful conduct that excluded alternate technologies, Microsoft would have been able to obtain access to necessary technology in the Relevant Technology Markets on reasonable and non-discriminatory terms.

9. Therefore, to remedy harms already inflicted and to prevent further harm to Microsoft's business and property, including its line of cellular devices, and further harm to competition more generally in the Relevant Technology Markets, Microsoft brings this action for treble damages, declaratory relief, and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

## **PARTIES**

10. Plaintiff MMI is a Delaware corporation with a registered agent at 2711 Centerville Road, Suite 400, Wilmington, DE, 19808.

11. Plaintiff MMO is a Finnish corporation having its principal place of business at Keilalahdentie 2-4, Espoo 02150, Finland.

12. MMO is engaged in the cellular device business, including the manufacture and sale of cellular telephones, tablets, and other devices. MMO was established in 2013 as an

indirectly wholly-owned subsidiary of Microsoft Corporation in connection with Microsoft Corporation's acquisition of Nokia Inc. and the Devices and Services business of Nokia Corporation. MMO and its subsidiary Nokia Inc. succeeded to all relevant assets, liabilities, and claims in relation to the acts alleged in this Complaint as part of Microsoft Corporation's acquisition of Nokia Corporation's Devices and Services business. Nokia Corporation remains, post-acquisition, a separate corporate entity that is unaffiliated with Microsoft Corporation or Plaintiffs.

13.     MMI is the successor corporation to Nokia Inc., which was acquired from Nokia Corporation by MMO on April 25, 2014, as a wholly-owned subsidiary. Nokia Inc. became a wholly-owned subsidiary of Microsoft Corporation in August 2014, and took its current name in May 2015.

14.     Defendant InterDigital, Inc. ("IDI") is organized under the laws of Pennsylvania. Upon information and belief, its principal place of business is at 200 Bellevue Parkway, Suite 300, Wilmington, DE  19809.

15.     Defendant InterDigital Communications, Inc. ("InterDigital Communications") is a Delaware corporation. Upon information and belief, its principal place of business is at 781 Third Avenue, King of Prussia, Pennsylvania  19406.

16.     Defendant InterDigital Technology Corporation ("InterDigital Technology") is a Delaware corporation. Upon information and belief, its principal place of business is at 300 Delaware Avenue, Suite 527, Wilmington, DE  19801.

17.     Defendant InterDigital Patent Holdings, Inc. ("InterDigital Patent Holdings") is a Delaware corporation. Upon information and belief, its principal place of business is at 200 Bellevue Parkway, Suite 300, Wilmington, DE  19809.

18. Defendant InterDigital Holdings, Inc. ("InterDigital Holdings") is a Delaware corporation. Upon information and belief, its principal place of business is at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.

19. Defendant IPR Licensing, Inc. ("IPR Licensing") is a Delaware corporation. Upon information and belief, its principal place of business is at 3411 Silverside Road, Wilmington, DE 19810.

20. Upon information and belief, InterDigital Communications, InterDigital Technology, InterDigital Holdings, InterDigital Patent Holdings, and IPR Licensing are wholly-owned direct or indirect subsidiaries of IDI. IDI, InterDigital Communications, InterDigital Technology, InterDigital Holdings, InterDigital Patent Holdings, and IPR Licensing act as a common, unified economic enterprise. Upon information and belief, IDI has dictated and controlled the actions of InterDigital Communications, InterDigital Technology, InterDigital Holdings, InterDigital Patent Holdings, and IPR Licensing as described herein.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over this action pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337, and 2201-02.

22. Defendants are subject to this Court's personal jurisdiction pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

23. Defendants are also subject to this Court's personal jurisdiction because they regularly solicit and conduct business in this District and have minimum contacts with this District. Among other contacts, IDI, InterDigital Technology, InterDigital Holdings, InterDigital Patent Holdings, and IPR Licensing maintain their principal places of business in this District, and they do substantial business in this District; InterDigital Communications, InterDigital

Technology, InterDigital Holdings, InterDigital Patent Holdings, and IPR Licensing are Delaware corporations; IDI, InterDigital Communications, InterDigital Technology, InterDigital Holdings, InterDigital Patent Holdings, and IPR Licensing are registered to do business in Delaware and maintain a registered agent for service of process in Delaware; and IDI, InterDigital Communications, and, upon information and belief, InterDigital Technology, InterDigital Holdings, InterDigital Patent Holdings, and IPR Licensing do substantial business in this District and operate out of facilities or offices in this District.

24.    Because of Defendants' contacts with this District, the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.

25.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b)-(d). A substantial part of the events giving rise to the claim set forth in this action occurred in this District, including InterDigital's pursuit of non-FRAND royalties and injunctive relief against Microsoft in the United States District Court for the District of Delaware.

**STANDARD-SETTING AND PATENT HOLD-UP**

26.    Cellular telephones and other cellular devices, including those manufactured by Microsoft, must comply with the technical standards promulgated by the European Telecommunications Standards Institute ("ETSI"). ETSI promulgates cellular standards as drafted by its members acting through consensus. By creating these standards, ETSI members choose which technologies will be available to consumers and which technologies will be excluded. Cellular devices that do not conform to the adopted standards will not work with network infrastructure equipment. Cellular devices that do not use the technologies specified in the standard thus have little, if any, market value, regardless of technical merit.

27.     Once ETSI members select a technology for a particular function in a standard that becomes widely employed, alternative technologies that could have performed that function (or alternative functions) are effectively excluded. Likewise, ETSI cellular standards erect a substantial barrier to innovation in alternate technologies. Cellular device makers are "locked-in" to the standard-specified technology, regardless of its short or long term merits, and are limited in their ability to innovate or use alternative technologies.

28.     The ETSI standards at issue here arise from the collaboration of competitors, including telecommunications companies, equipment and infrastructure manufacturers, and other interested parties. Cellular standards, such as 3G and 4G, are voluminous sets of requirements and protocols that must be followed for cellular devices to connect to the cellular network. Much of each standard is built on the technology of prior generations of standards and is in the public domain, not covered by any patents. However, some of the technologies included in the standards may be covered by patents. If the standard specifies the use of particular technology that is covered by patents, then devices that are in compliance with the standard *necessarily* infringe those SEPs.

29.     Because a device that is in compliance with the standard has to practice each and every SEP, the owners of SEPs—even the owner of just one SEP—can, unless restrained, demand and obtain exorbitant royalties for the use of its patents, far in excess of the value, if any, of its patented technology independent of its inclusion in the standard. If unwilling to pay such excessive license prices, device makers face the risk of being foreclosed from using any portion of the standard, including the unpatented and public domain technologies. This threat of foreclosure, if left unchecked, puts a manufacturer's investment at risk.

30.     The exploitation of SEPs to extract unreasonable or discriminatory royalties is referred to as patent "hold-up." Patent hold-up harms competition and impedes implementation of standards and any consumer benefits that flow from widespread adoption of the standard. The requirement that SEPs be licensed on FRAND terms is imposed to curb this potential for anticompetitive abuse and its effects.

31.     The anticompetitive effects of hold-up are magnified in the context of the 3G and 4G standards, where there are thousands of SEPs held by many different patent holders. The cumulative royalty burden required to satisfy all SEP holders is referred to as royalty stacking. To avoid the anticompetitive consequences of royalty stacking, a SEP holder is limited to the value of its SEPs. The SEP holder is prohibited from charging a premium based on having the technology covered by the SEP written into the standard or from the value of the standard itself. Likewise, because the total royalty must be reasonable, the demands of any individual SEP owner must be assessed in light of the total number of SEPs included in the standard.

32.     ETSI has implemented an Intellectual Property Rights ("IPR") Policy for the various standards it promulgates. ETSI's IPR Policy seeks to protect against members' abuse of the monopoly power that SEPs provide. In addition to other limitations imposed by law, ETSI members must adhere to ETSI's IPR Policy.

33.     The ETSI IPR Policy requires members to disclose on a timely, bona fide basis all intellectual property rights that they believe may be essential to a proposed ETSI standard. In particular, Clause 4.1 of the current ETSI IPR Policy, which is materially the same as earlier versions, provides that:  "each [ETSI] MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where

it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion." This obligation extends to members' affiliates as well.

34.    The ETSI IPR Policy further mandates an irrevocable FRAND licensing commitment by the owner of potential SEPs. Clause 6.1 of the ETSI IPR Policy states:  "When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms and conditions …." Clauses 6.1 lists "MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE" as among the uses for which SEP holders must make mandatory FRAND licensing commitments. And, FRAND commitments, pursuant to Clause 6 of the ETSI IPR Policy, "shall be interpreted as encumbrances that bind all successors-in-interest."

35.    The FRAND commitments in ETSI's IPR policy:  (a) limit royalties to the value that the SEP(s) had prior to inclusion in the ETSI standard and in light of other patented and unpatented technology essential to the standard; (b) prohibit charging royalties that are higher based solely upon the covered technology being written into the standard or that capture the value of the standard itself; and (c) require that the same royalties and terms be available to competing licensees.

36.    During the critical period that precedes adoption of a standard, cost and performance characteristics of technologies under consideration are taken into account by ETSI members in deciding whether any particular technology will be written into the standard. Costs include any royalties that may need to be paid for use of standardized technologies.

37.     If an ETSI participant is unwilling to commit to licensing its patents on FRAND terms and conditions, the ETSI IPR Policy makes that a dispositive consideration in whether that participant's technologies should be considered for inclusion. Clause 8.1.1 of the ETSI IPR Policy states:  "Where prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall … satisfy itself that a viable alternative technology is available …." In those instances in which, in the opinion of the General Assembly, no viable alternative technology exists, Clause 8.1.2 further provides that work on the standard or technical specification at issue "shall cease." On information and belief, InterDigital understood that the consequence of a refusal to commit to license its declared SEPs on FRAND terms pursuant to Clause 6.1 of the ETSI IPR Policy was the exclusion of its patented technologies from the 3G and 4G standards. Accordingly, InterDigital made false promises to license on FRAND terms and conditions, in order to deceive ETSI members into incorporating its technologies. In addition to providing InterDigital with the power flowing from the inclusion of its patented technologies in the ETSI standards, InterDigital's false promises excluded alternate technology from incorporation in the standard.

## RELEVANT TECHNOLOGY MARKETS

38.     For purposes of Microsoft's antitrust claim, the relevant markets are the markets for technologies covered by the InterDigital patents issued in the United States and elsewhere that are essential, or are alleged to be essential, to the 3G and 4G cellular standards (the "Standards"), together with all other alternative technologies to the InterDigital patents that could have been used in the cellular standards. Throughout, these are referred to collectively as the "Relevant Technology Markets."

39.     Once ETSI adopts technology for a cellular standard, the owner of each essential patent used in that standard obtains monopoly power in a relevant technology market. When patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology, and companies wanting to market devices that comply with the standard are "locked in" and must use the SEPs. InterDigital has submitted declarations of essentiality regarding many of its patents to the Standards, and made accompanying declarations to license those patents on FRAND terms. The markets encompassed within the Relevant Technology Markets can thus be identified from InterDigital's licensing declarations to ETSI.

40.     Before the adoption of the Standards, competitors in the Relevant Technology Markets included companies with technology capable of performing the same or equivalent functions which could have been adopted by ETSI and its members. Additional competitors include the companies that offered technologies that could have been used in alternate cellular standards that were foreclosed once ETSI members adopted a standard that included InterDigital technologies.

41.     However, because of the lock-in effect described above, once the Standards were adopted with the InterDigital technology specified, InterDigital became the only commercially viable seller inside and outside the United States in each of the Relevant Technology Markets.

### INTERDIGITAL'S UNLAWFUL ACQUISITION OF MONOPOLY POWER

42.     InterDigital's revenues are derived almost entirely from licensing its patents. Patents related to cellular technology that is not included in the cellular standards have no market power because the standards effectively dictate what technology must be used and what technology will not be used. Consequently, InterDigital participated in the drafting and

development of ETSI Standards to ensure that the Standards as written included InterDigital's patented technologies.

43.     InterDigital also has a powerful interest in obtaining as many patents as possible that cover technologies adopted by the Standards. Having a very large list of patents and patent applications to represent as being essential to ETSI Standards allows InterDigital to put maximum pressure on prospective licensees—i.e., standard implementers—and to extract maximum royalties for licensing its patents.

44.     As a member of ETSI, InterDigital had an opportunity to manipulate the standard-setting process and its own patent procurement efforts to serve its own anticompetitive goals. In conjunction with the adoption of the Standards, InterDigital made submissions to the technical bodies within ETSI, declaring that certain of its patents or patent applications may be or become essential to the cellular standards under consideration. InterDigital also purported to commit to license any such essential patents it held on FRAND terms. InterDigital submitted the following declarations to ETSI, true correct copies of which are attached as exhibits:

| Date | InterDigital Entity | Signatory | Place Executed | Project(s) or Standard(s) | Exhibit |
|------|---------------------|-----------|----------------|---------------------------|---------|
| 10/4/01 | InterDigital Technology | H. Goldberg | Philadelphia, PA | UMTS | 1 |
| 10/4/01 | InterDigital Technology | H. Goldberg | Philadelphia, PA | GSM | 2 |
| 4/8/04 | InterDigital Technology | D. Boles | Wilmington, DE | UMTS (TS41.101 Rel. 5) | 3 |
| 4/8/04 | InterDigital Technology | D. Boles | Wilmington, DE | GSM (TS41.101 Rel. 4) | 4 |
| 3/21/07 | InterDigital Technology | B. Bernstein | n/a | UMTS; E-UMTS | 5 |
| 9/19/08 | InterDigital Patent Holdings | B. Ditty | Wilmington, DE | UMTS; E-UMTS; GERAN | 6 |
| 9/19/08 | InterDigital Technology | B. Ditty | Wilmington, DE | GSM; UMTS; E-UMTS; GERAN | 7 |
| 9/14/09 | InterDigital Patent Holdings | B. Ditty | Wilmington, DE | UMTS; E-UMTS; GERAN | 8 |
| 9/14/09 | InterDigital Technology | B. Ditty | Wilmington, DE | GSM; UMTS; E-UMTS; GERAN | 9 |
| 9/16/10 | InterDigital Patent Holdings | B. Ditty | Wilmington, DE | UMTS; LTE; GERAN | 10 |
| 10/31/11 | InterDigital Patent Holdings | B. Ditty | Wilmington, DE | UMTS; LTE; RRS; M2M | 11 |
| 10/31/11 | InterDigital Technology | B. Ditty | Wilmington, DE | UMTS; LTE | 12 |

| 11/30/12 | InterDigital Patent Holdings | B. Ditty | Wilmington, DE | UMTS; LTE; RRS; M2M | 13 |
|---|---|---|---|---|---|
| 11/30/12 | InterDigital Technology | B. Ditty | Wilmington, DE | UMTS; LTE | 14 |
| 11/26/13 | InterDigital Patent Holdings | B. Ditty | Wilmington, DE | UMTS; LTE; RRS; M2M | 15 |
| 11/26/13 | InterDigital Technology | B. Ditty | Wilmington, DE | GSM; UMTS; LTE | 16 |
| 9/26/2014 | InterDigital Technology | B. Ditty | Wilmington, DE | UMTS; LTE | 17 |
| 9/26/2014 | InterDigital Patent Holdings | B. Ditty | Wilmington, DE | UMTS; LTE; RRS; M2M | 18 |
| 9/26/2014 | IPR Licensing | B. Ditty | Wilmington, DE | LTE | 19 |

45.     InterDigital made these declarations to ensure that the 3G and 4G Standards (and earlier cellular network standards) incorporated its technologies such that any manufacturers of Standard-complaint devices would need a license to InterDigital's claimed SEPs, as well as to exclude alternative technologies. In doing so, InterDigital concealed its intent to engage in hold-up, to discriminate in its licensing, to tie licenses to its non-SEPs, to tie licenses to foreign patents and payment of royalties on a worldwide basis without regard to actual patent scope, and to charge supra-competitive royalty rates and discriminatory terms for its declared essential patents so that ETSI members would include technologies InterDigital claims to have patented.

46.     Pursuant to the ETSI IPR Policy, work on the portions of the Standards at issue would have ceased if InterDigital had been truthful about its unwillingness to license on FRAND terms and conditions. But for InterDigital's deception, alternate technologies would have been adopted by ETSI or no particular technology would have been specified.

47.     Further, InterDigital appropriated to its own name technologies proposed by other parties and made known to InterDigital's employees in the course of technology discussions at ETSI. For example, one set of such technology discussions was conducted through the TSG Radio Access Network Working Group 1 ("TSG-RAN Working Group 1," hereinafter referred to as the "Working Group").

48.     The Working Group met on multiple occasions in 2002 and 2003 to discuss proposals for the standard under consideration at the time (e.g., high-speed uplink packet access). Prior to each such discussion, the members of the Working Group drafted written proposals. Those submissions were distributed to all of the members of the Working Group, including representatives from InterDigital and at least two of the named inventors on InterDigital's U.S. Patent 7,941,151 ("the 151 Patent"), Marian Rudolf and Stephen Dick. Rudolf or Dick or both attended multiple meetings of the Working Group from at least mid-2002 through late 2003.

49.     One of the issues addressed by the Working Group was how to efficiently assign network resources to multiple cellular devices to send and receive data. Other companies, including Motorola and Siemens, made proposals within the Working Group directed to technology to be used in the coming standard for this purpose. At least Rudolf and Dick were present at Working Group sessions when these proposals were discussed and the related written materials were provided.

50.     Thereafter, InterDigital filed a patent application naming Rudolf, Dick and other InterDigital employees as named inventors based on subject matter disclosed to them in the course of meetings of and submissions to the Working Group. That application ultimately issued as the '151 Patent, which InterDigital has alleged to be a SEP with respect to the ETSI-promulgated 4G Standard in relation to efficient assignment of network resources among multiple cellular devices. InterDigital has asserted the '151 Patent against Microsoft and others, seeking to exclude Microsoft 4G devices from the U.S. and leveraging that threat to demand supra-competitive royalties for worldwide sales.

51.     On information and belief, InterDigital has employed a similar misappropriation strategy with respect to other patents within the Relevant Technology Markets. InterDigital has

thus further gained access through the standard-setting process to technical information belonging to other ETSI members, and exploited this information to obtain additional patents essential to the Standards and pursue non-FRAND royalties. Through this additional deception, InterDigital has thereby added to the number of alleged SEPs in its portfolio, increasing its ability to hold-up Standard implementers for its unreasonable and discriminatory licensing demands.

## INTERDIGITAL'S MONOPOLY POWER IN THE RELEVANT TECHNOLOGY MARKETS

52.     InterDigital misled the other participants in ETSI's standard-setting process into believing it was committing to grant licenses on FRAND terms, inducing them to become locked-in to using InterDigital's SEPs. InterDigital now asserts that its ETSI FRAND declarations:  (a) do not create an enforceable contractual obligation to grant licenses on FRAND terms; (b) do not require it to even entertain offers to license any less than its entire portfolio of SEPs and non-SEPs; and (c) do not bar InterDigital from using the threat of injunctive or other exclusionary remedies to extort supra-competitive prices and terms for its purported SEPs.

53.     As a result of its manipulation of the standard-setting process, its deceptive FRAND commitments, and its misappropriation of subject matter proposed by other standard-setting participants, InterDigital now purports to control more than 1000 of the more than 40,000 patents that have been declared to be essential to the 3G UMTS standard and more than 800 of the 60,000 patents that have been declared to be essential to the 4G LTE standard.

54.     InterDigital has thus, by its deceptive promises and manipulation of the standard-setting process, unlawfully excluded competing technologies from each of the Relevant Technology Markets and unlawfully acquired monopoly power in those markets. As the sole supplier in the Relevant Technology Markets, InterDigital has the power to extract supra-

competitive prices. Because implementers are locked in to the Standards, and the Standards require use of technologies over which InterDigital claims to have patents, there are high or insurmountable barriers to entry in the Relevant Technology Markets.

## INTERDIGITAL'S ABUSE OF ITS MONOPOLY POWER

55.     InterDigital's licensing practices abuse its monopoly position. InterDigital is holding-up Microsoft to force it to pay:  (1) supra-competitive worldwide royalties on discriminatory terms for InterDigital's declared SEPs, and (2) for a license to its non-SEPs as a condition for accessing the declared SEPs. InterDigital has continued its abusive licensing conduct unabated, but now directly against Microsoft, since Microsoft acquired the Nokia Devices and Services business in April, 2014.

### A.     InterDigital's Demands For Supra-Competitive Royalties And Terms.

56.     InterDigital refuses to make a license to its SEPs available to Microsoft and others on FRAND terms. Instead, InterDigital insists that it is entitled to recover an unlawful premium on its patents over and above any value that those patents may have had prior to and independent of inclusion in the Standards simply because InterDigital succeeded in having patented technology written into the Standards.

57.     InterDigital further ties its supra-competitive royalty demands to the entire value of the cellular devices—typically as an arbitrary percentage of the overall price of the cellular devices. These cellular devices offer countless features unrelated to the Standards and in addition to the chip components that implement the Standards. The chip components sell for just a few dollars or, at most, tens of dollars, whereas the cellular devices typically sell for hundreds of dollars, reflecting value completely unrelated to the value of the Standard or to the value of any SEP prior to inclusion in the Standard.

58.     InterDigital's royalty demands also exceed FRAND due to the aggregate royalty for implementing the 3G and 4G Standards in question that would result from their acceptance. InterDigital cannot show that its license offers to Microsoft, standing alone, are reasonable based on the value of its SEPs, if any, independent and exclusive of their inclusion in the Standards. In addition, hundreds of other entities own thousands of patents declared essential to the Standards. No entity could realistically implement the Standards if subjected to licensing demands from all SEP holders on the scale of InterDigital's demands. InterDigital's creation of new licensing entities and assignment of selected SEPs to those entities has compounded this royalty stacking effect. InterDigital's licensing conduct has thus subjected the Relevant Technology Markets to patent hold-up.

59.     InterDigital has further abused its monopoly power by refusing to grant Microsoft a FRAND license to the few purported SEPs that it has asserted in litigation unless Microsoft also takes and pays for a license to InterDigital's entire portfolio of SEPs and non-SEPs. InterDigital is leveraging the monopoly power associated with its SEPs to tie a license for those patents to the remainder of its portfolio, despite the fact that they are separate products and can be licensed separately.

60.     InterDigital has likewise attempted improperly to expand the geographic impact of its declared-essential patents by leveraging its U.S. SEPs. InterDigital refuses to license any of its SEPs unless Microsoft agrees to pay royalties on worldwide sales, regardless of the actual geographic footprint and legal scope or value of InterDigital's patent portfolio outside the U.S.

61.     InterDigital has also abused its monopoly power in pricing its SEPs in a manner that unfairly discriminates against Microsoft and other newer, lower-volume entrants in the cellular device industry. InterDigital's volume discounts raise costs to newer, lower-volume

cellular device suppliers, to the benefit of larger, more entrenched manufacturers, thereby
adversely affecting competition in downstream markets for cellular devices.

**B.   InterDigital's Creation Of Additional Licensing Entities To Extract Higher And Discriminatory Royalties.**

62.   In October 2013, shortly after Microsoft announced its intended acquisition of the
Nokia Devices and Services business, InterDigital arbitrarily transferred hundreds of patents to a
new licensing entity for enforcement against Standards implementing companies. InterDigital
created the Signal Trust for Wireless Innovation ("Signal Trust") as this new licensing entity.
InterDigital is the primary beneficiary of any licensing revenues secured by Signal Trust.

63.   In 2015, Signal Trust demanded that Microsoft take a license to the transferred
InterDigital patents separate and apart from any license Microsoft might obtain from InterDigital
for any remaining patents in InterDigital's portfolio. Contemporaneously, InterDigital confirmed
that its licensing demands for its portfolio exclusive of the patents transferred to Signal Trust had
not been reduced from its prior demands for its entire portfolio.

64.   On information and belief, InterDigital had previously licensed Microsoft's
competitors to its combined portfolio without requiring additional and separate royalties for
rights to the patents transferred to Signal Trust. In this manner, InterDigital has discriminated
against Microsoft to the advantage of Microsoft's competitors and weakened Microsoft's ability
to compete in the sale of cellular devices.

**C.   InterDigital's Required Secrecy To Hide Its Discriminatory Royalty Demands.**

65.   InterDigital shrouds its licensing negotiations and agreements with a veil of
secrecy, refusing to discuss licensing terms for its SEP portfolio unless the standard-
implementing, would-be licensee agrees to keep all related communications secret. If the
standard-implementing party will not agree to keep secret InterDigital's licensing proposals for

its SEPs, InterDigital refuses to make licenses to its SEPs available. InterDigital correspondingly refuses to disclose the terms on which it has made its SEPs available to the competitors of would-be licensees, such as Microsoft, insisting that its non-disclosure agreements prevent that information being made available.

66.     InterDigital requires secrecy with the purpose and effect of furthering its patent hold-up and discrimination. Secrecy enables InterDigital to extract supra-competitive royalties, engage in discriminatory licensing, and to further abuse its monopoly power. Transparency in licensing of SEPs would, in contrast, enable prospective licensees to assess more effectively InterDigital's non-compliance with its FRAND commitments and expose its pattern and practice of violating its FRAND obligations.

67.     On information and belief, and based on public court decisions and announcements, InterDigital has discriminated against Microsoft in its licensing demands. To access its alleged SEP portfolio, InterDigital demands that Microsoft pay higher rates than its larger competitors. InterDigital refused to provide Microsoft with its pricing proposals made to other standard-implementing companies so that Microsoft can compare those proposals with InterDigital's demands to confirm non-discriminatory terms.

68.     On information and belief, InterDigital has required all other actual and would-be licensees to its alleged SEP portfolio to agree to secrecy as a precondition for any licenses, licensing proposals, and related discussions.

69.     InterDigital uses the shroud of secrecy over its licensing proposals and discussions to maximize the monopoly profits. InterDigital refuses to disclose relevant licensing information, including royalty amounts, offered to Microsoft's competitors.

**D.      InterDigital's Strategy To Enforce Its Monopolistic Licensing Demands.**

70.      InterDigital supports its hold-up and discrimination against Standards
implementers, like Microsoft, by threatening them with exclusion and other prohibitive orders
that would prevent the importation into the United States of any products that include Standards-
compliant technology. Since 2007, InterDigital has pursued a campaign of multiple, sequential
infringement actions under 19 U.S.C. § 1337 at the International Trade Commission against the
Nokia Devices and Services business, which is now owned by Microsoft. In these infringement
actions, InterDigital uses patents that InterDigital declared as essential or potentially essential to
the 3G and 4G Standards, including ITC Investigation No. 337-TA-613 (the "613
Investigation"), ITC Investigation No. 337-TA-800 (the "800 Investigation"), and ITC
Investigation No. 337-TA-868 (the "868 Investigation").

71.      When companies succumb to the threats and pressures exerted by InterDigital and
agree to take licenses to InterDigital's essential patents, InterDigital, on information and belief,
typically requires that the licensee agree never to challenge the essentiality or validity of its
licensed essential patents. This helps to ensure that the InterDigital patents remain in force, and
the merit of InterDigital's self-proclaimed assertions of essentiality will never be tested in the
courts.

72.      InterDigital's ITC litigation campaign confirms its intent to avoid its FRAND
commitments. In making the FRAND promises required to have its patented technologies written
into ETSI standards, InterDigital surrendered any right to pick and choose which standard
implementers could receive licenses. InterDigital surrendered the right to exclude standard
implementers who are able to license on FRAND terms. InterDigital's FRAND commitment was
intended to guarantee that InterDigital would not attempt to keep would-be implementers from

using its patented material, such as by seeking an injunction, but would instead proffer licenses on FRAND terms consistent with its commitment.

73.     But the sole remedies that are potentially available in a § 1337 proceeding are exclusionary, prohibiting a standard-implementing defendant from importing or selling any standard compliant product in the U.S. The ITC cannot award money damages and, accordingly, it cannot award the FRAND price that is all InterDigital would be entitled to receive for any use of its alleged SEPs.

74.     The ongoing threats, costs, and significant interference with Microsoft's ongoing efforts to grow its cellular telephone market share caused by InterDigital's ITC actions are intended to force Microsoft to capitulate to InterDigital's tying of its SEPs and non-SEPs and the other abusive and anticompetitive aspects of its licensing demands. In addition, the threat of exclusion, however remote, puts at risk the entire revenue and investment for all of the technology used in Microsoft cellular devices, not just the proportion that allegedly uses InterDigital's SEPs. The magnitude of the potential lost investment and revenue flowing from an exclusion order is so high that would-be licensees in Microsoft's position can be strong-armed into submitting to InterDigital's excessive and discriminatory demands. Any loss of goodwill and reputation would be irreparable.

75.     InterDigital's subjective motivation to cause anticompetitive harm by its threats and ITC filings is reflected in the statements of its CEO, William Merritt. Merritt conceded publicly in investor conference calls that InterDigital does not, in fact, want the remedy of an exclusion order. Instead, InterDigital intends to leverage the risk of an exclusion order in negotiations with prospective licensees, such as Microsoft:  "ultimately, [InterDigital's] objective is actually not to secure exclusion …."

76.     InterDigital's subjective motivation to cause anticompetitive harm through its threats and ITC filings is further reflected in its studied effort to avoid assessment of the FRAND value of its SEPs in District Court litigation. When Microsoft sought to have InterDigital's SEP portfolio valued by declaratory judgment action, InterDigital fought successfully to have that action dismissed. At that same time, InterDigital continued its pursuit of exclusionary relief against Microsoft's products through its ITC actions, where it argued that its demanded price for its portfolio was reasonable, without providing any proof of the actual value of its SEPs independent of their inclusion in the Standards.

77.     InterDigital also has had no objective basis, given its FRAND licensing commitments and the adverse rulings it has received in prior ITC cases, to expect that it will ultimately prevail on its requests for exclusionary relief against Microsoft. For example, in the 613 Investigation, the same baseband processors implementing the same accused 3G standard-specified process were determined not to infringe the asserted patents in the previously resolved ITC 868 Investigation. InterDigital has conceded the adverse outcome of the 868 Investigation. Yet InterDigital insisted on continuing to subject Microsoft to the expense and inconvenience of another ITC trial in the 337-TA-613 Investigation and related briefing. Likewise, despite the Federal Circuit's non-infringing claim construction that InterDigital conceded (in the 868 Investigation), which should apply to the patents asserted in the 613 Investigation, InterDigital insists that briefing and consideration of the 613 Investigation continue. InterDigital's only possible motive in prolonging these actions in the 613 Investigation is to subject Microsoft to continuing threats, expenses, and inconvenience, in an attempt to coerce capitulation to InterDigital's abusive licensing demands. InterDigital's intent to inflict these costs with no

reasonable expectation of success is further reflected in its prior concession that the Federal Circuit's reading of the asserted patents, in which its ruling rested, was correct.

78.     The fact that InterDigital actually seeks far more than fair compensation for the patents asserted in the ITC actions is also shown by its refusal to accept payment even at its own inflated rates for a license of those patents. In January 2013, Nokia tendered to InterDigital a check for $25 million. That payment was more than sufficient to cover Nokia's past and future U.S. sales through January 1, 2014 at the running royalty rate that InterDigital was then demanding for past sales on a worldwide basis. Likewise, in January 2015, Microsoft tendered to InterDigital a check in the amount of $28.5 million. That payment was more than sufficient to cover Microsoft's and Nokia's past U.S. sales through at least the end of 2014 at the royalty rate that InterDigital had demanded for past worldwide sales.

79.     Nevertheless, in both instances, InterDigital refused to accept payment. Instead, InterDigital maintained the threat of obtaining an exclusion order to coerce Microsoft into capitulating in payment of royalties on worldwide sales without regard to the actual geographic footprint and legal scope or value of its patent portfolio, with royalties tied to both its SEPs and non-SEPs, and with other unreasonable and discriminatory terms.

**E.     Harm To Microsoft And To Competition In The Relevant Technology Markets.**

80.     InterDigital has harmed competition in the Relevant Technology Markets. InterDigital's deceptive promises to ETSI during the process of adopting the Standards excluded alternative cellular technologies. InterDigital's deception in the standard-setting process also harmed competition by obscuring the costs of including its patented technologies in the Standards, increasing the likelihood that its patent rights would be included and confer monopoly power on InterDigital. InterDigital's wrongful conduct in conjunction with the ETSI standard

setting prevented Microsoft from obtaining access to necessary technology in the Relevant Technology Markets on reasonable and non-discriminatory terms.

81.     As a consequence of InterDigital's unlawful monopolization, customers in the Relevant Technology Markets, such as Microsoft, face higher costs for access to cellular technologies necessary for the manufacture of Standard-compliant products than they would have paid in a competitive market.

82.     As a consequence of InterDigital's transfer of patents to Signal Trust, Microsoft faces inherently discriminatory royalty demands for access to InterDigital's SEPs. Standing alone, InterDigital's transfer of patents necessarily added to the cost for access to the cellular technologies allegedly necessary for the manufacture of Standard-compliant products even beyond that which Microsoft would have paid in a competitive market, harming Microsoft's ability to compete in the sale of cellular devices.

83.     The antitrust injury associated with InterDigital's unlawful monopolization of the Relevant Technology Markets also extends to consumers in the downstream market for cellular devices, in the form of higher prices, reduced innovation, and more limited choice for such Standard-compliant products. The necessary result of raising costs to some competing manufacturers in the cellular device marketplace and diverting resources and monies that otherwise would have fueled additional innovation in cellular devices has been to limit consumer choices in complementary cellular technologies and other technology used in cellular telephones and other devices.

84.     InterDigital has leverage over manufacturers of Standard-compliant products that it would not possess but for its false promises to license on FRAND terms and its unlawful acquisition of monopoly power in the Relevant Technology Markets. Because of such leverage,

manufacturers of Standard-compliant products, including Microsoft, must either capitulate to InterDigital's supra-competitive licensing demands or face the costs and risks of protracted patent litigation. The antitrust injury attributable to InterDigital's overall anticompetitive scheme thus includes the litigation fees and costs necessary to avoid the payment of supra-competitive licensing terms and exclusion from the marketplace for Standard-compliant products.

85.     In the case of Microsoft, the costs, duration, and threat of the ITC proceedings brought against it by InterDigital have been substantial and have represented a constant additional cost to Microsoft's cellular device business. In addition to subjecting Microsoft to millions of dollars in attorneys' fees and other costs of litigation, including discovery burdens imposed on Microsoft's partners and customers, the risk of an exclusion order creates uncertainty as to Microsoft's line of cellular devices. InterDigital's litigation tactics thus not only cause Microsoft antitrust damages in the form of the substantial costs of litigation, but they also threaten to erode customer loyalty, brand recognition, and customer goodwill for Microsoft's cellular devices. Increased costs for Microsoft harm Microsoft's sales, and harm to Microsoft's sales harms competition in the market for cellular devices.

86.     In the absence of the injunctive relief requested herein, there is a substantial threat that Microsoft will be forced to capitulate to InterDigital's supra-competitive licensing demands. The artificial imposition of higher costs on Microsoft threatens further loss of market share, as does the threat of an exclusion order from the ITC. Whichever way InterDigital exploits its unlawfully-acquired monopoly power, the harm to Microsoft is both imminent and irreparable, because market share once lost in the sale of cellular devices may never be recovered.

## COUNT I
### (Monopolization in Violation of Section 2 of the Sherman Act)

87.     Microsoft re-alleges and incorporates by reference the allegations set forth in paragraphs 1–86 above.

88.     By its acts, practices and conduct, InterDigital has unlawfully monopolized each of the Relevant Technology Markets.

89.     InterDigital has monopoly power in the Relevant Technology Markets. It is the sole supplier in those markets, has excluded all competition, and has the power to charge supra-competitive prices.

90.     As a direct and proximate result of InterDigital's unlawful monopolization, Microsoft has suffered irreparable injury to its business and property and is threatened with additional harm in the form of the loss of customers and potential customers, the loss of product image and goodwill, and other irreparable harm to its line of cellular devices.

91.     In addition to the harm to Microsoft, consumers of cellular devices are injured and threatened with further injury from InterDigital's unlawful monopolization because it has the effect of raising the cost of access to all products that implement the Standards. This unlawful tax on Standard-compliant products reduces output and retards innovation.

## PRAYER FOR RELIEF

WHEREFORE, Microsoft respectfully requests that this Court enter the following relief in its favor and against InterDigital:

A.     Judgment in favor of Microsoft and against InterDigital;

B.     A declaration that InterDigital has monopolized the Relevant Technology Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.      A declaration that each of InterDigital's U.S. patents declared by it to be essential to the Standards (the "U.S. SEPs") is unenforceable;

D.      A declaration that any and all contracts or agreements that InterDigital has entered into in furtherance of its unlawful conduct are void;

E.      An award of treble Microsoft's damages, in an amount to be proven at trial, caused by InterDigital's monopolistic conduct;

F.      Injunctive relief requiring that InterDigital:  (1) make available to Microsoft a non-confidential license to its U.S. SEPs on FRAND terms as determined by a court; and (2) disclose to Microsoft the terms and conditions pursuant to which it has licensed or offered to license its SEPs;

G.      Injunctive relief preventing InterDigital from taking any steps to enforce against Microsoft any exclusion orders it might receive from the ITC with respect to one or more of its SEPs;

H.      Injunctive relief requiring InterDigital to re-assign any declared SEPs that it has assigned to controlled entities, such as Signal Trust;

I.      An order granting Microsoft its attorneys' fees and costs; and

J.      Such other and further relief as the Court deems just and proper.

Dated: August 20, 2015

David T. Pritikin
(*pro hac vice* application forthcoming)
Richard A. Cederoth
(*pro hac vice* application forthcoming)
rcederoth@sidley.com
David C. Giardina
(*pro hac vice* application forthcoming)
dgiardina@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

Respectfully submitted,

*/s/ Francis DiGiovanni*
Francis DiGiovanni (#3189)
Francis.DiGiovanni@dbr.com
Thatcher A. Rahmeier (#5222)
Thatcher.Rahmeier@dbr.com
DRINKER BIDDLE & REATH LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone (302) 467-4200
Facsimile (302) 467-4201

Paul H. Saint-Antoine
Paul.Saint-Antoine@dbr.com
(*pro hac vice* application forthcoming)
DRINKER BIDDLE & REATH LLP
One Logan Square
Philadelphia, PA  19103
Telephone:  (215) 988-2700
Facsimile:  (215) 988-2757

T. Andrew Culbert
(*pro hac vice* application forthcoming)
andycu@microsoft.com
Stacy Quan
(*pro hac vice* application forthcoming)
Stacy.Quan@microsoft.com
MICROSOFT CORPORATION
1 Microsoft Way
Redmond, WA  98052
Telephone:  (425) 882-8080

*Counsel for Plaintiffs Microsoft Mobile Inc.*
*and Microsoft Mobile Oy*