IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICROSOFT MOBILE INC. and MICROSOFT MOBILE OY,<br><br>                    Plaintiffs;<br>v.<br><br>INTERDIGITAL, INC., INTERDIGITAL COMMUNICATIONS, INC., INTERDIGITAL TECHNOLOGY CORPORATION, INTERDIGITAL PATENT HOLDINGS, INC., INTERDIGITAL HOLDINGS, INC., and IPR LICENSING, INC.,<br><br>                    Defendants. | Civil Action No. 15-723-RGA |

**MEMORANDUM ORDER**

Presently before the Court is Defendants' Motion to Dismiss and Motion to Strike (D.I. 16). Defendants (collectively "IDC") request dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and move to strike pursuant to Fed. R. Civ. P. 12(f). The issues have been fully briefed. (D.I. 17, 20, 21). The Court heard oral argument on March 1, 2016. (D.I. 26). For the reasons set forth herein, IDC's motion to dismiss and to strike is **DENIED**.

On August 20, 2015, Plaintiffs (collectively "Microsoft") filed this suit, alleging unlawful monopolization under § 2 of the Sherman Act. (D.I. 1). Microsoft's claim relates to IDC's interactions with a standard-setting organization and the enforcement of certain standard-essential patents ("SEPs") that IDC claims to hold. The European Telecommunications Standards Institute ("ETSI") promulgates standards with which cellular devices must comply in order to effectively communicate with wireless network infrastructure. (*Id.* ¶ 26). ETSI, in choosing which technologies are incorporated into the standard, may incorporate patented

1

technologies that then become "essential" to the standard. (*Id.* ¶¶ 3, 28). Holders of these SEPs may, absent adequate safeguards, demand exorbitant royalties in a so-called "patent hold-up." (*Id.* ¶¶ 29, 30). To combat this problem, ETSI seeks an irrevocable commitment from owners of potential SEPs to license SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms. (*Id.* ¶¶ 32, 34).

Microsoft alleges that IDC, in order to induce ETSI to incorporate IDC's patented technology into the 3G and 4G standards, falsely promised to license its SEPs on FRAND terms. (*Id.* ¶¶ 4, 42, 44-45, 52). But for IDC's deception, Microsoft alleges, ETSI would have included in the standards alternate technologies or not specified any technology at all. (*Id.* ¶ 46). Microsoft alleges that, through this standard-setting process, IDC unlawfully acquired monopoly power, and further, that IDC has exploited this power by refusing to honor its FRAND licensing obligations, transferring SEPs to related entities to "double dip" royalty demands, tying U.S. patent licenses to foreign patent licenses, tying SEP licenses to non-essential patent licenses, and requiring royalties on worldwide sales. (*Id.* ¶¶ 6, 56-69). Additionally, Microsoft alleges that IDC has "pursued baseless infringement actions and baseless demands for injunctive relief and exclusion orders designed to increase Microsoft's costs and thereby coerce Microsoft to capitulate to InterDigital's unreasonable, non-FRAND demands." (*Id.* ¶¶ 6, 70-79).

In its motion to dismiss, IDC argues that Microsoft has failed to adequately plead a § 2 monopolization claim. To state a claim for monopolization, the plaintiff must plead the possession of monopoly power in a relevant market and anticompetitive conduct on the part of the possessor. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-08 (3d Cir. 2007). Monopoly power may be shown through "direct evidence of supracompetitive prices and restricted output" or it may be "inferred from the structure and composition of the relevant

2

market." *Id.* at 307. "To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant entry barriers protect that market." *Id.* (quotation marks omitted). "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* In *Broadcom*, the Third Circuit stated that, when patented technology is incorporated into a standard, "measures such as FRAND commitments become important safeguards against monopoly power." *Id.* at 314. Therefore, in the context of "a consensus-oriented private standard-setting environment," "a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms, . . . coupled with [a standard-setting organization's] reliance on that promise when including the technology in a standard, and . . . the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct." *Id.*

Here, it is difficult to discern any material differences between Microsoft's complaint and the complaint which the Third Circuit found sufficient in *Broadcom*.[1]

The Court first addresses monopoly power. The complaint defines the relevant markets as "the markets for technologies covered by the InterDigital patents . . . that are essential, or alleged to be essential, to the 3G and 4G cellular standards . . ., together with all other alternative technologies to the InterDigital patents that could have been used in the cellular standards." (D.I.

---

[1] IDC argues that, as suggested in *Rambus Inc. v. FTC*, 522 F.3d 456, 466 (D.C. Cir. 2008), the Third Circuit's decision may be in tension with the Supreme Court's decision in *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135-37 (1998) (holding that a plaintiff must allege and prove harm to the competitive structure itself). First, the District of Delaware sits in the Third Circuit and is bound to follow its decisions. Second, I do not read *Broadcom* to be inconsistent with *NYNEX*. The plaintiff in *Broadcom* alleged that the standard-setting organization would not have adopted Qualcomm's technology but for Qualcomm's promise to license on FRAND terms. *Broadcom* recognized this and held that when a standard-setting organization "reli[es] on that promise when including the technology in a standard," there "is actionable anticompetitive conduct" which harms the competitive structure of the relevant markets. *Broadcom*, 501 F.3d at 314.

3

1 ¶¶ 26, 38-39; *compare id. with* D.I. 20, Ex. A ¶ 59). This "technology was not interchangeable with or substitutable for other technologies and adherents to the [relevant] standard have become locked in." *Broadcom*, 501 F.3d at 315 (citations omitted); (D.I. 1 ¶¶ 3, 26-27, 39, 41-42, 46, 54; *compare id. with* D.I. 20, Ex. A ¶¶ 7-8, 48, 58-59). IDC "had the power to extract supracompetitive prices, it possessed a dominant market share, and the market had entry barriers." *Broadcom*, 501 F.3d at 315 (citations omitted); (D.I. 1 ¶¶ 3, 29-31, 41, 45, 53-54; *compare id. with* D.I. 20, Ex. A ¶¶ 9-10, 13-14, 58, 82, 86-109). These allegations are sufficient to show monopoly power. *Broadcom*, 501 F.3d at 315; *see also Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 1672493, at *4-7 (N.D. Cal. May 14, 2012); *Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at *12-14 (W.D. Wis. June 7, 2011).

The Court next addresses anticompetitive conduct. The complaint alleges that IDC made an "intentional false promise that [it] would license its . . . technology on FRAND terms, on which promise [ETSI] relied in choosing the . . . technology for inclusion in the" relevant standards. *Broadcom*, 501 F.3d at 315 (citations omitted); (D.I. 1 ¶¶ 3-4, 40, 42, 45, 52, 54; *compare id. with* D.I. 20, Ex. A ¶¶ 9, 82, 84-85, 99, 140). This conduct "induced" ETSI to adopt a technology "that they would not have considered absent a FRAND commitment." *Broadcom*, 501 F.3d at 315 (citations omitted); (D.I. 1 ¶¶ 4, 41-42, 45-46, 52; *compare id. with* D.I. 20, Ex. A ¶¶ 3, 42, 140). Following the incorporation of its technology, the complaint alleges, IDC refused to comply with its FRAND licensing obligations. (D.I. 1 ¶¶ 6, 56-63, 65-66, 70-79; *compare id. with* D.I. 20, Ex. A ¶¶ 3, 12, 13, 86, 87-109). These allegations are sufficient to show anticompetitive conduct. *Broadcom*, 501 F.3d at 315; *see also Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 793, 796 (N.D. Tex. 2008); *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 1672493, at *4-7.

4

IDC also contends that Microsoft has failed to adequately allege injury. A plaintiff in a § 2 case "must prove a causal connection between [the antitrust violation] and actual damage suffered." *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1273 (3d Cir. 1995). Microsoft must plead more than injury to itself, however; it must show that IDC's conduct harms competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977). The injury issue is entwined, to some degree, with IDC's argument that Microsoft's claims are barred by the *Noerr-Pennington* doctrine. (D.I. 17 at pp. 10-13 (citing *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56, 66 (1993) (barring antitrust claim premised on assertion of copyright lawsuit))). IDC asserts that the only harms alleged by Microsoft are the "litigation fees and costs necessary to avoid the payment of supra-competitive licensing terms and exclusion from the marketplace for Standard-compliant products." (D.I. 17 at p. 19 (quoting D.I. 1 ¶ 84)). Since its litigation activity is protected by *Noerr-Pennington*, IDC argues, Microsoft's antitrust claim is barred.

IDC's assertion that Microsoft's complaint is "predicate[d] ... on an allegation that InterDigital seeks to enforce its patents against Microsoft via lawsuits and 'threats'" is inaccurate. (D.I. 17 at p. 11). Aside from any attorneys' fees or litigation costs, Microsoft's complaint includes allegations that IDC's wrongful conduct "prevented Microsoft from obtaining access to necessary technology" in the relevant markets; that "there is a substantial threat that Microsoft will be forced to capitulate to InterDigital's supra-competitive licensing demands;" that "the artificial imposition of higher costs on Microsoft threatens further loss of market share, as does the threat of an exclusion order;" that the "downstream market" is injured in the form of "higher prices, reduced innovation, and more limited choice[s] ... for such Standard-compliant products;" that "an exclusion order creates uncertainty as to Microsoft's line of cellular devices,"

which "threaten[s] to erode customer loyalty, brand recognition, and customer goodwill;" and that Microsoft "is threatened with additional harm in the form of the loss of customers and potential customers, the loss of product image and goodwill, and other irreparable harm to its line of cellular devices." (D.I. 1 ¶¶ 80-81, 83, 85-86, 90). For purposes of a motion to dismiss, these are sufficient allegations of antitrust injury. *See, e.g., Research In Motion*, 644 F. Supp. 2d at 793-96 ("[S]tandards, without the proper safeguards, are inherently anticompetitive. It follows that when an entity side-steps these safeguards in an effort to return the standard to its natural anti-competitive state, anti-competitive effects are inevitable. Motorola's breach of the commitments to IEEE and ETSI, as a result, is harmful to competition."); *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007); *Apple Inc. v. Samsung Elecs. Co.*, 2011 WL 4948567, at *6 (N.D. Cal. Oct. 18, 2011); *Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at *14. As a leading treatise notes: "if the antitrust violation is intentional deception of the standard-setting organization, the fact that one of the ways that causes harm is that the patentee sues adopters and seeks an injunction shouldn't defeat the antitrust claim based on conduct before the standard-setting organization." Herbert Hovenkamp et al., *IP and Antitrust* § 35.5b2 (2d ed. Supp. 2013).

Since Microsoft's complaint adequately alleges injury, the complaint cannot be dismissed on that basis. The Court must still determine, however, whether IDC's litigation conduct may be included as conduct which violates the antitrust laws. *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) (Antitrust liability depends on "the monopolist's conduct taken as a whole rather than . . . each aspect in isolation."); (D.I. 1 ¶ 4; D.I. 17 at pp. 11-13; D.I. 20 at 17-18). To strip a defendant of its *Noerr-Pennington* immunity for litigation activity, a plaintiff

6

must generally show either (1) "sham litigation" or (2) a *Walker Process* violation.[2] *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1311 (Fed. Cir. 2016) (citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071-72 (Fed. Cir. 1998)); *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, 2011 WL 678707, at *2-3 (D. Del. Feb. 18, 2011). Microsoft has argued that IDC engaged in sham litigation. Since I conclude that IDC's litigation conduct may be included as part of the overall scheme regardless of whether it is sham litigation, I will assume, for purposes of this motion, that IDC's conduct is not sham litigation. Circuit courts have reached different conclusions on the question of whether—in the absence of showing sham litigation or *Walker Process* fraud—litigation may be included as a component of a scheme to violate the antitrust laws. *Compare Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 882 (2d Cir. 1971) (suits may be included as part of unlawful scheme only when frivolous and thus not immune under *Noerr-Pennington*) *with Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir. 1952) (petitioning activity could be included as part of scheme, despite *Noerr-Pennington* immunity). While there are no cases from the Federal Circuit directly on point, at least one district court has concluded that the Federal Circuit would choose a middle ground "causal connection" test. *Hynix*, 527 F. Supp. 2d at 1095-97; *see also id.* at 1088-91; *Zenith Elecs., LLC v. Sceptre, Inc.*, 2015 U.S. Dist. LEXIS 33661, at *18 n.2 (C.D. Cal. Feb. 5, 2015). The court held "that before otherwise protected litigation can be part of an 'anticompetitive scheme' claim, the court must first find that the other aspects of the scheme

---

[2] The parties dispute whether Federal Circuit law or Third Circuit law applies to the question of *Noerr-Pennington* immunity. (D.I. 20 at 22 n.5; D.I. 21 at 12 n.4). "[W]hether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998). This applies "to all antitrust claims premised on the bringing of a patent infringement suit." *Id.* Since this dispute centers on whether IDC's patent litigation activities are protected by *Noerr-Pennington*, I conclude that Federal Circuit law applies to the question of whether *Noerr-Pennington* immunity exists.

7

independently produce anticompetitive harms," and upon so concluding, "the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms." *Hynix*, 527 F. Supp. 2d at 1097. The Court finds the reasoning in *Hynix* persuasive. Having concluded that IDC's deceptive conduct before ETSI suffices to make out a § 2 monopolization claim (with injury tied to that deception), the Court now concludes that IDC's litigation conduct is "'causally connected' to that behavior and therefore properly included in an 'anticompetitive scheme' allegation." *Id.* at 1098. IDC's suits to enforce its purported SEPs are part of the way in which IDC accomplishes its alleged anticompetitive scheme. The entire scheme "is ineffective without the threat of litigation." *Id.*

While the *Hynix* opinion noted that it took a view contrary to that of Professors Hovenkamp, Janis, and Lemley,[3] it is worth noting that those treatise authors have since stated that the outcome in *Hynix* "makes sense." Herbert Hovenkamp et al., *IP and Antitrust* § 11.4f (2d ed. Supp. 2013). Specifically, the treatise notes that "the only difference between *Hynix* and the Second Circuit approach is one of damages: a plaintiff that can prove an antitrust violation without the use of protected petitioning can recover damages caused by that petitioning as well as damages by the conduct that proved the violation." *Id.*

IDC argues that Microsoft has failed to plead fraud with the particularity required by Fed. R. Civ. P. 9(b). Microsoft's claim is that IDC entered into a FRAND commitment with the

---

[3] The opinion also recognized that "[a] district court opinion . . . endorsed [the treatise's] conclusion when considering an alleged scheme of antitrust misconduct including patent litigation." *Id.* at 1097 (citing *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 428-30 (D. Del. 2006)). That decision, decided before *Hynix*, simply rejected the approach of *Kobe* and its progeny, finding it inconsistent with the Supreme Court's ruling in *Professional Real Estate*. *Abbott Labs.*, 432 F. Supp. 2d at 428-30. *Hynix* also rejected *Kobe*, but found that the Federal Circuit would conclude that "good faith patent litigation" could be included "as part of the anticompetitive scheme" only when "causally connected" to other aspects of the scheme which produce independent anticompetitive harms. *Hynix*, 527 F. Supp. 2d at 1095-97.

8

intent not to comply with that commitment. Since this claim sounds in fraud, it must meet the Rule 9(b) pleading standards. *Apple Inc. v. Samsung Elecs. Co.*, 2011 WL 4948567, at *4 n.5; *see also Broadcom*, 501 F.3d at 315 n.9 (noting the issue, but not deciding it). Rule 9(b) may be satisfied by pleading the "date, place or time" of the fraud. *Board of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 n.10 (3d Cir. 2002). Microsoft's complaint includes nineteen declarations that IDC submitted to ETSI. Since these declarations identify "when the false FRAND declarations were made, by whom, and for which patents," they are sufficient under Rule 9(b). *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1672493, at *7; *see also Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at *14.

IDC briefly argues that Microsoft's claim is barred by the four-year statute of limitations in 15 U.S.C. § 15b. (D.I. 17 at p. 24). IDC contends that to the extent any claims accrued before August 20, 2011 (four years prior to filing), they should be time-barred. *See Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 815 F.2d 270, 277-78 (3d Cir. 1987). This argument fails under the continuing violation doctrine, which provides that "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Since the complaint alleges misrepresentations that occurred as late as September 2014, and that IDC is engaged in an ongoing scheme that has resulted in continuing injury, IDC's statute of limitations argument fails.

IDC moves to strike prayers for relief C, D, and F from the complaint. In those prayers, Microsoft requests a declaration that the U.S. patents IDC has declared to be essential are unenforceable, a declaration that all contracts and agreements entered in furtherance of its unlawful conduct are void, and injunctive relief requiring IDC to make a non-confidential license on FRAND terms available to Microsoft and to disclose the terms of its other licenses and offers

to license. The Court is not persuaded that there is any value in granting IDC's motions to strike. The Court may strike from a pleading, pursuant to Fed. R. Civ. P. 12(f), any "immaterial" or "impertinent" matter. *Delaware Health Care v. MCD Holding Co.*, 893 F. Supp. 1279, 1291-92 (D. Del. 1995). "Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded," while "[i]mpertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (2d ed. 1990)). While a court has "broad discretion" under Rule 12(f), "striking a party's pleadings is an extreme measure, and, as a result, . . . [such motions] are viewed with disfavor and are infrequently granted." *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000) (quotation marks omitted). Since I do not find that the prayers for relief are immaterial or impertinent, I think IDC's attempt to eliminate the requested relief is premature.

For the reasons stated above, IDC's motion to dismiss and to strike (D.I. 16) is **DENIED**.

It is **SO ORDERED** this 13 day of April, 2016.

                                                    /s/ Richard G. Andrews
                                                    United States District Judge